NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0149-15T3

ANTHONY MARRA, individually
and as a member of MARTINSVILLE
REALTY ASSOCIATES, LLC,

 Plaintiff-Respondent/
 Cross-Appellant,

v.

MITCHELL T. BERLANT, ROBERT D.
BERLANT, and MARTINSVILLE REALTY
ASSOCIATES, LLC,

 Defendants-Appellants/
 Cross-Respondents.
_____________________________________

 Argued October 24, 2017 – Decided November 6, 2017

 Before Judges Fasciale, Sumners and Moynihan.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Somerset County, Docket No.
 C-012067-11.

 David P. Wadyka argued the cause for
 appellants/cross-respondents (DiFrancesco,
 Bateman, Kunzman, Davis, Lehrer & Flaum, PC,
 attorneys; Mr. Wadyka, of counsel and on the
 briefs; Allison L. Segal, on the briefs).

 Matthew J. Lodge argued the cause for
 respondent/cross-appellant (Carroll McNulty &
 Kull LLC, attorneys; Mr. Lodge, of counsel and
 on the briefs; Nicholas A. Vytell, on the
 briefs).

PER CURIAM

 These appeals reach us after a Chancery Division judge (the

judge) conducted a fifteen-day bench trial. Mitchell T. Berlant

(Mitchell), Robert D. Berlant (Robert), and Martinsville Realty

Associates, LLC (MRA) (collectively defendants) appeal from a

September 3, 2015 final judgment in favor of plaintiff Anthony

Marra, individually and as a member of MRA. Plaintiff cross-

appeals from the same judgment. We remand for recalculation of

the award after subtracting plaintiff's $10,000 capital

distribution plus related interest. We affirm in all other

respects.

 Plaintiff pled the following causes of action: declaratory

judgment (Count One); removal of the Berlants from MRA (Count

Two); dissolution of MRA (Counts Three and Four); breach of

fiduciary duty (Count Five); breach of contract (Operating

Agreement) (Count Six); breach of contract (Loan Repayment

Agreement) (Count Seven); breach of the duty of good faith and

fair dealing (Count Eight); conversion (Count Nine); conspiracy

to commit conversion (Count Ten); fraudulent and negligent

misrepresentation (Count Eleven); conspiracy to commit fraud

(Count Twelve); promissory estoppel (Count Thirteen); unjust

 2 A-0149-15T3
enrichment (Count Fourteen); and intentional infliction of

emotional distress (Count Fifteen). Defendants pled several

affirmative defenses, including laches and statute of limitations

(SOL).

 Before the trial, defendants moved for summary judgment on

all counts except Count Seven. The motion judge granted their

motion solely as to Count Six holding plaintiff knew or should

have known, at the latest in 2004, that defendants had breached

the Operating Agreement, and therefore, plaintiff's claim was

filed outside of the six-year SOL. The motion judge issued a

lengthy written opinion further explaining the basis for his

ruling.

 After the trial, the judge found that plaintiff owned fifty-

percent of MRA, which the judge did not dissolve. He also vacated

the grant of summary judgment entered by the motion judge on Count

Six. The judge found no evidence that plaintiff had reason to

believe that defendants had repudiated his interest in MRA. The

judge found that Mitchell had affirmed plaintiff's position as an

owner by executing two option agreements to purchase plaintiff's

interest and plaintiff continued to receive distributions. The

judge found defendants only repudiated plaintiff's ownership

interest in 2011 and plaintiff's claim was not barred by the SOL.

 The judge entered a $794,673 judgment against Mitchell and

 3 A-0149-15T3
Robert, which the judge reached by totaling $372,778 in capital,

$223,790 for fifty-percent of the equity, $35,500 for half of the

litigation costs paid by MRA, and $162,605 interest "on the

differential between Marra's capital account and the Berlants'

[capital] account over the years." The judge reconsidered his

interest calculation, but did not change the amount.

 On the appeal, defendants argue the judge erred by finding

plaintiff was a fifty-percent owner of MRA; failing to apply the

appropriate SOL or doctrine of laches; and calculating plaintiff's

award. On the cross-appeal, plaintiff contends the judge

erroneously concluded the Revised Uniform Limited Liability

Company Act (RULLCA), N.J.S.A. 42:2C-1 to -94, was inapplicable,

and as a result, plaintiff seeks a remand for the judge to award

him fees.

 Our standard of review requires deference to a judge's

findings "unless they are so wholly unsupportable as to result in

a denial of justice." Greenfield v. Dusseault, 60 N.J. Super.

436, 444 (App. Div.), aff'd o.b., 33 N.J. 78 (1960); see also Rova

Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84

(1974). We review questions of law de novo. Greenfield, supra,

60 N.J. at 444.

 4 A-0149-15T3
 I.

 We begin by addressing defendants' contention that the judge

erred by failing to apply the SOL or doctrine of laches. Although

not expressly stated in his written opinions, it appears the judge

found for plaintiff on Counts One, Two, Three, Four, Six and Seven.

Some of the Counts sought equitable relief and some sought money

damages.

 We agree with the judge that the doctrine of laches does not

bar plaintiff's complaint. "Laches is an equitable doctrine,

operating as an affirmative defense that precludes relief when

there is an 'unexplainable and inexcusable delay' in exercising a

right, which results in prejudice to another party." Fox v.

Millman, 210 N.J. 401, 417-18 (2012) (quoting Cty. of Morris v.

Fauver, 153 N.J. 80, 105 (1998)). Our Supreme Court has found

laches to be "an equitable defense that may be interposed in the

absence of the [SOL]." Lavin v. Hackensack Bd. of Educ., 90 N.J.

145, 151 (1982).

 The Court has explained that laches is "invoked to deny a

party enforcement of a known right when the party engages in an

inexcusable and unexplained delay in exercising that right to the

prejudice of the other party." Knorr v. Smeal, 178 N.J. 169, 180-

81 (2003). "Laches may only be enforced when the delaying party

had sufficient opportunity to assert the right in the proper forum

 5 A-0149-15T3
and the prejudiced party acted in good faith believing that the

right had been abandoned." Id. at 181. "Our courts have long

recognized that laches is not governed by fixed time limits, but

instead relies on analysis of time constraints that 'are

characteristically flexible.'" Fox, supra, 210 N.J. at 418

(citation omitted) (quoting Lavin, supra, 90 N.J. at 151). Whether

laches applies "depends upon the facts of the particular case and

is a matter within the sound discretion of the trial court."

Mancini v. Twp. of Teaneck, 179 N.J. 425, 436 (2004) (quoting

Garrett v. Gen. Motors Corp., 844 F.2d 559, 562 (8th Cir.), cert.

denied, 488 U.S. 908, 109 S. Ct. 259, 102 L. Ed. 2d 248 (1988)).

 In determining whether to apply laches, the court should

consider the length of the delay, the reasons for the delay, and

any changing circumstances of the parties during the delay.

Fauver, supra, 153 N.J. at 105. As to the delay, the court should

look to an analogous SOL, and laches applies where "a claim derived

from a statutory right had been lost through failure to make a

timely demand therefor." Fox, supra, 210 N.J. at 420 (citing

Lavin, supra, 90 N.J. at 152).

 "The [SOL], by its express terms, applies only to actions at

law and may not be invoked as a defense against a claim exclusively

equitable." Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.,

197 F. Supp. 627, 629 (D.N.J. 1961), aff'd, 307 F.2d 210 (3d Cir.

 6 A-0149-15T3
1962), cert. denied, 372 U.S. 929, 83 S. Ct. 872, 9 L. Ed. 2d 733

(1963). Contract claims have a six-year SOL. N.J.S.A. 2A:14-1.

The "discovery" doctrine "provides that in an appropriate case a

cause of action will be held not to accrue until the injured party

discovers, or by an exercise of reasonable diligence and

intelligence should have discovered that he may have a basis for

an actionable claim." Lopez v. Swyer, 62 N.J. 267, 272 (1973).

"Whether a particular cause of action is barred by a [SOL] is

determined by a judge" and is a determination of legal consequence.

Estate of Hainthaler v. Zurich Commercial Ins., 387 N.J. Super.

318, 325 (App. Div.), certif. denied, 188 N.J. 577 (2006). We

therefore owe no deference to the judge's decision and review de

novo. Ibid.

 Defendants contend that the causes of action "appeared to

accrue in August 2001 when [p]laintiff signed documents indicating

he was not a member of MRA." Defendants argue that plaintiff knew

about his causes of action in September 2002, when he obtained

counsel and asked Mitchell to sign an amended operating agreement.

Defendants argue further that when Mitchell refused to sign,

plaintiff should have known that Mitchell did not believe plaintiff

was a member of MRA. According to defendants, plaintiff did not

receive a K-1 or distributions from MRA, which they maintain

"strongly suggest to a reasonable person that he was not considered

 7 A-0149-15T3
by the Berlants to be a member of MRA."

 The judge disagreed with defendants' position, finding:

 The Berlants[] did not . . . manifest their
 position that Marra was not an owner until
 2011 when they stopped making monthly payments
 to him . . . and Marra had no reason to believe
 before then that the Berlants took the
 position that he was merely a creditor. Even
 at trial Mitchell was equivocal stating that
 Marra could have become an owner if he
 fulfilled certain obligations. This action
 was timely filed within a few months after MRA
 stopped paying Marra.

 . . . .

 There is no evidence that defendants
 repudiated Marra's interest in MRA until 2011.
 Moreover, during the six years beginning on
 January 1, 2003, Mitchell affirmed Marra's
 ownership interest when he executed . . . the
 option[] agreements to acquire Marra's
 interest. Similarly, J-41, undoubtedly
 drafted by a Berlant or a Berlant employee,
 affirms Marra's status as an owner . . . and
 pursuant to that letter, dated December 15,
 2005, MRA began disbursing $4[]000 a month to
 Marra, all within the six-year period
 commencing January 1, 2003. The court finds
 that during 2003 and 2004 Mitchell assured
 Marra that all was well with the project and
 that the Berlants were not receiving
 distributions either. Thus, the full trial
 record establishes that during the '03-'04
 period Marra had no reason to believe that
 defendants were repudiating his interests in
 MRA.

 We conclude that there is sufficient evidence in the record

to support the judge's findings. Although plaintiff signed both

the August 31, 2001 letter and operating agreement removing him

 8 A-0149-15T3
from ownership, he believed that it was a formality only to satisfy

the bank to obtain a loan, and Mitchell hand-wrote on the letter

that plaintiff was still a fifty-percent owner of MRA.

 The record demonstrates plaintiff's first objectively

reasonable indication that he was not considered a member of MRA

occurred in the spring of 2011, when he stopped receiving his

monthly loan repayment checks, and when he received a series of

correspondence from Mitchell. He filed suit in August 2011, within

months of learning of the Berlants' position. Whether considering

his actions under the SOL or laches, plaintiff's actions were

reasonable.

 II.

 We reject defendants' contention that the judge erred by

finding plaintiff was a fifty-percent owner of MRA. Here, there

exists substantial credible evidence in the record to support the

judge's findings.

 The judge referenced a December 2002 letter that Mitchell

sent to plaintiff with financial information regarding a MRA

project, finding "[i]t is the type of information that would be

provided to an owner." The judge also pointed to the June 2005

proposed option agreements, noting that "[o]ne does not enter into

an option to buy an owner's interest if the seller is not an owner;

these documents constitute Mitchell's acknowledgment in June 2005

 9 A-0149-15T3
that Marra is an owner." The judge further noted plaintiff's

December 2005 letter, in which he recognized that plaintiff

granting the Berlants rights to manage the project would not have

made sense unless plaintiff had a stake in the company.

 The judge continued:

 The Berlants' position is that Marra is not
 an owner because he failed to make required
 contributions of dollars and effort to MRA.
 The court rejects this position. There is no
 letter, e-mail or other document or
 corroborative evidence to establish that the
 Berlants ever made a demand or even a polite
 request of Marra to do anything regarding MRA
 that he had not done. Mitchell was the
 managing member and the court finds that he
 preferred to control, without interference,
 the construction, financing and operation of
 MRA. The court notes, in this regard, that
 money went into and out of MRA to and from
 other Berlant entitles without adequate
 explanation of the purpose of those
 transactions. Indeed, there is not an invoice
 or other objective record to establish the
 actual cost of the office buildings
 constructed by MRA under Berlant supervision.
 The court finds that on some occasions the
 Berlants used MRA as a bank for their other
 entities, and on other occasions used other
 entities as banks for MRA. Thus it suited
 them to keep Marra uninvolved and at a
 distance.

 The Berlants also contend that they
 eliminated Marra's ownership interest because
 with Marra as a debtor they would be unable
 to limit their debtor liability to several
 guarantees instead of joint and several
 guarantees. The court rejects this
 contention. The Berlants were required to

 10 A-0149-15T3
 provide joint and several guarantees even
 without Marra's participation as a debtor.

 Furthermore, the New Jersey Limited Liability Company Act,

N.J.S.A. 42:2B-1 to -70, was in effect.1 The act addressed how an

LLC should address members who fail to comply with an operating

agreement:

 An operating agreement may provide that
 a member who fails to perform in accordance
 with, or to comply with the terms and
 conditions of, the operating agreement shall
 be subject to specified penalties or specified
 consequences, and at the time or upon the
 happening of events specified in the operating
 agreement, a member shall be subject to
 specified penalties or specified
 consequences.

 [N.J.S.A. 42:2B-26.]

 Similarly, N.J.S.A. 42:2B-33(c) stated:

 An operating agreement may provide that
 the limited liability company interest of any
 member who fails to make any contribution that
 he is obligated to make shall be subject to
 specified penalties for, or specified
 consequences of, such failure. Such penalty
 or consequence may take the form of reducing
 or eliminating the defaulting member's
 proportionate interest in a limited liability
 company, subordinating his limited liability
 company interest to that of nondefaulting
 members, a forced sale of his limited
 liability company interest, forfeiture of his
 limited liability company interest, the
 lending by other members of the amount
 necessary to meet his commitment, a fixing of

1
 This section was repealed and replaced effective March 18,
2013, with the RULLCA, N.J.S.A. 42:2C-1 to -94.

 11 A-0149-15T3
 the value of his limited liability company
 interest by appraisal or by formula and
 redemption or sale of his limited liability
 company interest at such value, or other
 penalty or consequence.

 None of the operating agreements here provided for any

consequences to members who did not perform as expected.

Defendants did not take any action against plaintiff, not even so

much as a letter asking for compliance, when plaintiff allegedly

failed to perform as they had expected. The lack of formal

appropriate documents further supports the judge's finding that

the Berlants liked having little oversight and no formal rules so

that they could operate MRA in concert with their other businesses

as it suited them.

 III.

 Defendants argue that the judge erred when he failed to credit

loans to MRA from Berlant-owned companies against plaintiff's

interest in MRA.

 Defendants argue the judge failed to consider C-1, a document

marked after the trial concluded, which was a balance sheet for

MRA as of July 1, 2015, reflecting a balance due to other Berlant

entities totaling $454,265.

 The judge rejected, as being credible, defendant's contention

that the Berlant entities loaned MRA $454,265 for expenses,

including the cost of litigation. He found:

 12 A-0149-15T3
 These loans are not credible. The court
 addressed in its . . . opinion the manner in
 which the Berlants moved money into and out
 of their various entities in a process the
 court now characterizes as a financial shell
 game. The court also found that "[d]efendants
 also mismanaged MRA's books and ignored
 accounting standards, as catalogued by
 Chodor." . . . The Berlants have no
 credibility regarding the integrity and
 reliability of their bookkeeping. Moreover,
 defendants['] loan claims are an attempt to
 supplement the trial record. For example, J-
 56 is a collection of MR[A] balance sheets for
 the period through December 31, 2012. C-1,
 marked on July 15, 2015, adds a balance sheet
 "as of July 1, 2015."

 [(first alteration in original).]

The judge correctly rejected what C-1 purported to say.

 Alternatively, defendants argue that even if the judge

properly excluded C-1 from admission into evidence, a balance

sheet dated November 5, 2014, which the judge considered, reflected

a balance due to Berlant entities totaling $195,765. Defendants

contend "there is no evidence to establish that the loans made to

MRA by other Berlant-owned entities were fictitious," and thus the

judge erred by failing to include the alleged loan amounts due

other entities.

 There is sufficient evidence in the record to support the

judge's findings to the contrary. There is no indication that the

amounts on the balance sheets were actually "loans." Defendants

could have produced records showing a loan or invoice to

 13 A-0149-15T3
corroborate the "loan." The Berlants testified on the subject,

but the judge found their testimony incredible, finding that

defendants were involved in a "financial shell game." Applying

our standard of review, we have no reason to disturb those

findings.

 IV.

 Defendants argue that the judge erred when he included

plaintiff's $10,000 capital contribution as part of the judgment

against them. We agree.

 It is undisputed that plaintiff was required to make a $10,000

capital contribution. Plaintiff testified that he made this

contribution by issuing a check in the amount of $50,000 made

payable to Monogram, a Berlant-owned business. He claimed that

he sat with Mitchell, who showed him "various costs that were

due," and Mitchell told him the contribution he needed to make to

cover the costs. Plaintiff wrote the check to Monogram, but he

supplied no backup information because plaintiff "trusted"

Mitchell. Mitchell and Robert both testified that plaintiff did

not make the capital contribution.

 In his July 2, 2015 opinion, the judge stated:

 Plaintiff's initial capital contribution
 consisted of the Conroy property and another
 $10,000 contribution for a total of $442,648.
 The court rejects plaintiff's contention that
 the capital contribution was $513,000 because

 14 A-0149-15T3
 there is insufficient evidence to support it.
 Plaintiff relies on his unilateral
 calculations and a check drawn to Monogram, a
 Berlant entity not related to MRA.

 Plaintiff claimed that the capital contribution was included

in the check to Monogram. The judge found plaintiff's testimony

unsupported, but concluded that plaintiff made the $10,000 capital

contribution. We therefore conclude that this limited finding as

to the contribution is unsupported by the record and remand for a

recalculation of the judgment minus the $10,000 alleged capital

contribution.

 V.

 Defendants argue that the judge's purported award of $162,605

in prejudgment interest was "grossly excessive and constituted an

abuse of discretion." We conclude that the judge's award of

"interest" did not constitute "prejudgment interest."

 The judge awarded "interest on the differential between

Marra's capital account and the Berlants' [capital] account over

the years." Plaintiff's expert, Lawrence Chodor (Chodor),

provided a report and explanation of how the court should calculate

the "interest" owed to plaintiff. A review of Chodor's testimony

shows that this amount constituted a measure of plaintiff's

damages, not an award on top of the damages to compensate plaintiff

for the loss of the use of his money. The judge did not refer to

 15 A-0149-15T3
prejudgment interest.

 Chodor calculated the interest from the date the Berlants

refinanced MRA's mortgage in December 2005 and paid themselves

$843,570, but did not pay plaintiff. He compared the capital

accounts of plaintiff and the defendants each year, then

"calculated the interest based on the rate of . . . the mortgage

at 5.875 that they had just refinanced." He further explained:

 Well, part of my process . . . in doing
 forensics is to determine the appropriate
 interest rate. So, there's a lot of variables
 that go into account. . . . [W]hat I could
 do with that is I could look at the risks
 associated with an unsecured loan to a highly
 leveraged property, and I could utilize
 various databases to come up with the risk
 adjusted rate. And that would probably be
 much higher than 5.875. I had a recent
 refinancing here, so I just went with that. I
 thought that was a conservative approach.

 But, the difference is the bank at 5.875
 is secured and has the property as collateral.
 Mr. Marra doesn't have any collateral, so his
 risk is higher. It would justify a higher
 rate, but I went conservative, and I just used
 the bank rate.

 Chodor again explained that he only applied interest to the

spread between plaintiff's capital account and defendants' capital

account; had he applied interest to the entire balance, the total

interest would have been much higher.

 In his July 2, 2015 opinion, the judge found:

 16 A-0149-15T3
 Chodor calculated interest based on the
 excess of Marra's capital over Berlant[s']
 capital. . . . But, Chodor's calculation of
 Marra's capital included the loan balance of
 $123,898. The parties' property contributions
 were booked as loans to be interest free.
 Interest will have to be recalculated based
 on the differential capital excluding the loan
 balance. Plaintiff's expert shall prepare an
 amended interest calculation; defendant[s']
 expert may respond to that calculation.

 In his August 5, 2015 opinion, the judge noted Chodor's

interest calculation of $242,728, but found it was "flawed by the

inclusion of the balance of Marra's original contribution which

was to be without interest." The judge adjusted "Chodor's interest

amount by backing out of the interest calculation $123,898, the

balance of Marra's original capital contribution" and awarded

"interest on the differential between Marra's capital account and

the Berlants' [capital] account over the years." The judge did

this by calculating

 the annual average of excess Marra capital for
 the [ten]-year period shown on Chodor's
 [calculation]. That average is: $375,339.
 The court then divided $123,898 by the
 average, which resulted in a ratio of 33%.
 The court then reduced Chodor's interest
 amount by 33%, leaving interest due to Marra
 of $162,605. The court recognizes that its
 interest adjustment is unsophisticated,
 perhaps even naïve. It is, however,
 rationally based on the evidence in the trial
 record. Nevertheless, either party may submit
 a recalculation of interest that excludes the
 $123,898 interest-free capital. . . . In the
 absence of a recalculation, judgment shall be

 17 A-0149-15T3
 entered in the amount of $632,068 + $162,605
 = $794,673.

 In his final opinion, dated August 18, 2015, the judge noted

that both parties submitted recalculations; plaintiff was "limited

to my instructions" but "defendants have exceeded them." He

rejected plaintiff's new calculations as "excessive." He kept the

interest at $162,605.

 There was no indication in Chodor's testimony that this

"interest" was intended to be a "prejudgment interest" award. He

made no mention of prejudgment interest; nor would it have been

appropriate for an expert to testify to that, as the application

and rate of prejudgment interest is solely within the discretion

of the trial court. Musto v. Vidas, 333 N.J. Super. 52, 74 (App.

Div.), certif. denied, 165 N.J. 607 (2000). Moreover, defendants'

argument that the judge never gave any reason for awarding

prejudgment interest supports that conclusion: the judge never

gave any reason because he was not awarding prejudgment interest.

 VI.

 On the cross-appeal, plaintiff argues the judge erred by

concluding that the RULLCA was inapplicable. Plaintiff maintains

that the consequence of that conclusion deprived him of a counsel

fees award. We conclude that the judge erred in his conclusion,

but such error was harmless because plaintiff was not entitled to

 18 A-0149-15T3
counsel fees under the RULLCA.

 In 2011, LLCs were governed by the New Jersey Limited

Liability Company Act, N.J.S.A. 42:2B-1 to -70. The RULLCA became

effective March 18, 2013. L. 2012 c. 50 § 96. Before March 1,

2014, the RULLCA governed only an LLC formed on or after the

effective date of the act and LLCs choosing to amend their

operating agreements. N.J.S.A. 42:2C-91(a). However, "[o]n and

after March 1, 2014, this act governs all limited liability

companies." N.J.S.A. 42:2C-91(b). Pursuant to N.J.S.A. 42:2C-

90, "[t]his act does not affect an action commenced, proceeding

brought, or right accrued before this act takes effect." The

judge interpreted the statute, which is entitled "Savings clause,"

to mean that the RULLCA "does not govern the issues in this

litigation."

 Plaintiff argues on appeal that the judge misinterpreted the

Savings clause in that savings clauses are "designed to preserve

a party's rights to pursue claims under a statute being repealed,

not to prevent them from asserting rights under the new statute".

Plaintiff relies on Parsippany Hills Assocs. v. Rent Leveling Bd.

of Parsippany-Troy Hills Twp., 194 N.J. Super. 34, 42-43 (App.

Div.) (citations omitted), certif. denied, 97 N.J. 643 (1984),

which states:

 19 A-0149-15T3
 In this State it is the general rule that
 where a statute is repealed and there is no
 saving clause or a general statute limiting
 the effect of the repeal, the repealed
 statute, in regard to its operative effect,
 is considered as though it had never existed,
 except as to matters and transactions passed
 and closed. Furthermore, it is settled law
 in this State that, unless vested rights are
 involved, the law in effect at the time of the
 disposition of the cause by an appellate court
 governs, rather than the law in effect at the
 time the cause was decided by the trial court.

 If a statute has no savings clause, a person who brought an

action under the previous law would lose those rights, even though

an action had already been commenced. Ibid. We agree with

plaintiff that the Savings clause in the RULLCA was intended to

preserve rights that accrued under the former law, not extinguish

rights that the party may have gained by the passage of the new

law. The judge allowed plaintiff to amend his complaint without

objection to include a claim for relief under the RULLCA. The

RULLCA was in effect before the decision in this action. Thus,

the judge was obliged to apply the law in effect at the time of

the decision and consequently erred in finding that the RULLCA did

not apply.

 Plaintiff believes, however, that he is entitled to counsel

fees under the RULLCA. Plaintiff makes that assertion relying on

N.J.S.A. 42:2C-48(c), which states:

 20 A-0149-15T3
 If the court determines that any party
 to a proceeding brought under paragraph (4)
 or (5) of subsection a. of this section has
 acted vexatiously, or otherwise not in good
 faith, it may in its discretion award
 reasonable expenses, including counsel fees
 incurred in connection with the action, to the
 injured party or parties.

Defendants, on the other hand, contend that N.J.S.A. 42:2C-48(c)

is only applicable in cases of dissolution, which did not happen

here. We agree with defendants.

 Article 7 of the RULLCA is entitled "Dissolution and Winding

up." The first part of Article 7, N.J.S.A. 42:2C-48, is entitled,

"Events causing dissolution." It states:

 a. A limited liability company is dissolved,
 and its activities shall be wound up, upon the
 occurrence of any of the following:

 . . . .

 (4) on application by a member, the entry by
 the Superior Court of an order dissolving the
 company on the grounds that:

 (a) the conduct of all or substantially
 all of the company's activities is
 unlawful; or

 (b) it is not reasonably practicable to
 carry on the company's activities in
 conformity with one or both of the
 certificate of formation and the
 operating agreement; or

 (5) on application by a member, the entry by
 the Superior Court of an order dissolving the
 company on the grounds that the managers or
 those members in control of the company:

 21 A-0149-15T3
 (a) have acted, are acting, or will act
 in a manner that is illegal or
 fraudulent; or

 (b) have acted or are acting in a manner
 that is oppressive and was, is, or will
 be directly harmful to the applicant.

 [N.J.S.A. 42:2C-48(a).]

The judge did not dissolve the company, but rather, ordered

defendants to buy-out plaintiff's share. Thus, by its plain terms,

N.J.S.A. 42:2C-48(c) is inapplicable.

 We conclude that the parties' remaining arguments are

"without sufficient merit to warrant discussion in a written

opinion." R. 2:11-3(e)(1)(E).

 We remand for recalculation of the final award after

subtracting plaintiff's alleged $10,000 capital distribution plus

its related interest. We affirm in all other respects. We do not

retain jurisdiction.

 22 A-0149-15T3